IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: | **Filed / Docketed**<br>**September 25, 2008** |
| TINA COFFEY WHITE, | Case No. 07-11482-M<br>Chapter 7 |
| Debtor. | |

| | |
|---|---|
| REGENT BANK & TRUST CO., N.A., | |
| Plaintiff, | |
| v. | Adv. No. 07-01133-M |
| TINA COFFEY WHITE, | |
| Defendant. | |

## MEMORANDUM OPINION

Summary judgment and fraud.  Ordinarily, these two terms mix like oil and water:  fraud claims rarely lend themselves to judicial resolution short of trial.  This case involves a simple guaranty of indebtedness.  The plaintiff contends that the guaranty is tainted by fraud and that the defendant should not escape her obligations under the guaranty through bankruptcy.  Defendant disagrees, and calls for summary judgment upon the premise that the plaintiff could not, within the bounds of the law, have relied upon either the alleged representations contained in the guaranty, or the financial statement given to support it.  The relevant facts are not in genuine dispute.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is

proper pursuant to 28 U.S.C. § 1409.[1]  Reference to the Court of this matter is proper pursuant to

28 U.S.C. § 157(a).  This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I).

## Summary Judgment Standard

The United States Court of Appeals of the Tenth Circuit has held that

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled
to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "material" fact is one "that
might affect the outcome of the suit under the governing law," *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and
a "genuine" issue is one for which "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Id.*

"In our circuit, '[t]he moving party carries the burden of showing beyond a
reasonable doubt that it is entitled to summary judgment.'" *Trainor v. Apollo Metal
Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir.2002) (quoting *Hicks v. City of
Watonga,* 942 F.2d 737, 743 (10th Cir.1991)). When the moving party does not have
the ultimate burden of persuasion at trial, it has both the initial burden of production
on a motion for summary judgment and the burden of establishing that summary
judgment is appropriate as a matter of law. *Id.* (citation omitted). "The moving party
may carry its initial burden either by producing affirmative evidence negating an
essential element of the non-moving party's claim, or by showing that the
nonmoving party does not have enough evidence to carry its burden of persuasion
at trial." *Id.* (citation omitted).

Conversely, if the moving party has the burden of proof, a more stringent summary
judgment standard applies. Thus, if the moving party bears the burden of proof, to
obtain summary judgment, it cannot force the nonmoving party to come forward with
"specific facts showing there [is] a genuine issue for trial" merely by pointing to
parts of the record that it believes illustrate the absence of a genuine issue of material
fact. *Mudrick v. Cross Services, Inc.,* 200 F. Appx. 338, 340 (5th Cir.2006) (citing
*Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).
Instead, the moving party must establish, as a matter of law, all essential elements
of the issue before the nonmoving party can be obligated to bring forward any

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States
Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

specific facts alleged to rebut the movant's case. *Id.*[2]

This standard is applicable in adversary proceedings.[3]

## Findings of Fact

The Court finds that there is no genuine issue as to the following material facts:[4]

1.    Regent Bank & Trust Company, N.A. ("Regent"), is a banking association authorized to transact business within the State of Oklahoma.

2.    Tina Coffey White ("Ms. White") is an individual residing within the State of Oklahoma.

3.    At all times between January 2000 and June 2006, Mr. John P. Fitzgerald ("Mr. Fitzgerald") was employed by Regent.

4.    In this adversary proceeding, Regent has designated Mr. Fitzgerald as its corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, and its expert witness on the issue of commercially reasonable banking practices.

5.    Summit Technology Park, Inc. ("Summit") was a corporation authorized to transact business within the State of Oklahoma.

6.    At all times relevant hereto, Ms. White held an ownership interest in Summit.

7.    On or about May 16, 2005, Regent loaned Summit the sum of $5,000,000 (the "Summit Loan").

8.    Mr. Fitzgerald was the officer at Regent with primary responsibility for the Summit

---

[2] *Pelt v. Utah*, 539 F.3d 1271, ___, 2008 WL 4061052, *8 (10th Cir. 2008).

[3] *In re Martinez*, 126 Fed. App'x. 890, 896, 2005 WL 648218 (10th Cir. 2005).

[4] This finding is limited to the pending motion for summary judgment filed by Tina Coffey White, Defendant herein (the "Motion").

Loan.

9.     At the time that Regent made the Summit Loan, Mr. Fitzgerald was a member of

Regent's loan committee.

10.    At the time Regent made the Summit Loan, Mr. B.C. Lee ("Mr. Lee") was President

of Regent, a member of Regent's loan committee, and also a member of its Board of

Directors.

11.    As a condition of the Summit Loan, Regent required that Ms. White execute and

deliver a personal guaranty of the Summit Loan.

12.    Ms. White executed such a guaranty on May 9, 2005 (the "Guaranty").

13.    Mr. Fitzgerald was the officer at Regent with responsibility for obtaining Ms.

White's financial information and signature on the Guaranty.

14.    The Guaranty contained the following language: "I absolutely and unconditionally

Guaranty to you [Regent] the payment and performance of the following described

debt (including all renewals, extensions, refinancings and modifications) of the

borrower [Summit]: LOAN 3243159 IN THE AMOUNT OF $5,000,000.00 DUE

05/16/25."

15.    As part of the Summit Loan transaction, Regent received a personal financial

statement dated March 31, 2005, and signed by Ms. White on May 9, 2005 (the

"May 2005 PFS").

16.    The May 2005 PFS was physically delivered to Regent by Paul White.[5]

17.    The May 2005 PFS indicated that Ms. White had a net worth of $713,131.

_____

[5] *Affidavit of J.P. Fitzgerald*, ¶ 13, Exhibit "D" to Regent's Response to the Motion.

4

18.     The May 2005 PFS listed a "business holding" identified as "PSI," and valued said holding at $475,000.

19.     The reference to "PSI" in the May 2005 PFS referred to PSI Investments, LLC.

20.     Ms. White executed a financial statement dated April 1, 2004 (the "Tina White April 2004 PFS") that was delivered to Regent as a part of the application for the Summit Loan.

21.     The Tina White April 2004 PFS listed a "business holding" identified as "PSI," and valued said holding at $402,000.

22.     The reference to "PSI" in the Tina White April 2004 PFS referred to PSI Investments, LLC. ("PSI").

23.     Mark White ("Mr. White") is the spouse of Ms. White.

24.     Prior to the closing of the Summit Loan, Regent had in its possession a financial statement for Mr. White dated April 1, 2004 (the "Mark White April 2004 PFS").[6]

25.     The Mark White April 2004 PFS and the Tina White April 2004 PFS contain identical listings of assets and liabilities, including but not limited to the valuation of the interest in PSI.

26.     At all times relevant hereto, PSI was owned by a corporation called 3312 Brothers, LLC.  Ms. White held no ownership interest in 3312 Brothers, LLC.

27.     On or about August 12, 2004, Mr. Lee, acting in his capacity as an officer of Regent, prepared a document entitled Credit Memorandum (the "PSI Credit Memorandum"). The PSI Credit Memorandum was prepared as part of a proposed loan to PSI.

---

[6] *Affidavit of J.P. Fitzgerald*, ¶ 9, Exhibit "D" to Regent's Response to the Motion.

28.    The PSI Credit Memorandum contained the following statement: "Peter, Paul, Mark and [REDACTED] White own 100% of 3312 Brothers, LLC which owns PSI Investments, LLC which in turn owns 7 Dominos Pizza franchises located in Tulsa, Bartlesville, Stillwater, and Guthrie."[7]

29.    Mr. Lee never informed Mr. Fitzgerald about the contents of the PSI Credit Memorandum.[8]

30.    Had Mr. Fitzgerald known about the information contained in the PSI Credit Memorandum, he would have considered the same before accepting a personal financial statement from Ms. White claiming an ownership interest in PSI.[9]

31.    The PSI Credit Memorandum contained a statement that PSI had an overall net worth of $292,182, and a tangible negative net worth of $44,493, as of December 31, 2003.

32.    The PSI Credit Memorandum contained a projection that PSI would have an overall net worth of $325,725, and a tangible negative net worth of $192,631, as of 2004.

33.    At no time relevant hereto did Ms. White own any interest in PSI or 3312 Brothers, LLC.

34.    The information contained in the Tina White April 2004 PFS and the May 2005 PFS with respect to Ms. White's ownership of PSI is not consistent with the PSI Credit Memorandum.

35.    At the time it made the Summit Loan, Regent was aware that Ms. White was

---

[7] *Defendant's Exhibit 3.*

[8] *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 83, Line 4 through Page 85, Line 23.

[9] *Id.*

6

primarily employed as a teacher at Holland Hall school in Tulsa.

36.     At the time it made the Summit Loan, Regent had in its possession the 2001 and 2002 joint tax returns for Mr. and Ms. White.[10]

37.     The 2001 tax return for Mr. and Ms. White reflects that Ms. White earned a total of $4,542 during 2001 from her employment at Holland Hall.

38.     The 2002 tax return for Mr. and Ms. White reflects that:

   a.      Ms. White earned a total of $10,158 during 2002 from her employment at Holland Hall;

   b.      Ms. White earned a total of $1,250 during 2002 from her employment at Southern Hills Country Club;

   c.      Mr. and Mrs. White received a total of $152 in dividends during 2002.

39.     Neither the 2001 tax return nor the 2002 tax return reflect that Ms. White had any ownership interest in or garnered any income from PSI.

40.     Based upon these tax returns, Mr. Fitzgerald, testifying as the corporate designee of Regent, testified that Ms. White's "historical income was not significant" and "that her contribution [to the Summit Loan under the terms of the Guaranty] would come from asset ownership in both the existing companies she has on her financial statement, [and] the start-up company she was taking a part of."[11]

41.     When presented with the fact that the tax returns did not reflect that Ms. White had

_____

[10]  *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 81, Lines 4 through 11.

[11]  *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 81, Line 22 through Page 82, Line 1.

an ownership interest in PSI, Mr. Fitzgerald, testifying as the corporate designee and designated expert witness of Regent, stated that, based upon his review of the tax returns and the May 2005 PFS, he would "ask the question to clarify the ownership of that PSI statement."[12]

42.     Mr. Fitzgerald, testifying as the corporate designee and expert witness for Regent on the issue of commercially reasonable loan practices, testified as follows:

Question:     (By Mr. Craige) Do you have an opinion about what are the standards and customs of evaluating the creditworthiness of lending – if you just look at what this says right here, little subparagraph (a), evaluating creditworthiness, do you have an opinion about what those standards and customs are?

Answer:     Investigation of the financial capabilities of both the borrower and guarantors by means of the financial statement and tax returns.

Question:     And should a reasonable lender consider information that its bank's president has in evaluating a financial statement?

Answer:     Yes.

Question:     Was that done in this case?

Answer:     Not everybody involved with the credit was made aware of everything that apparently the president knew or had in his possession.

Question:     Would that have been significant in this case?

Answer:     It appears that we've got two financial statements that conflict with each other.

Question:     So if you look down there where it says item number (2), what is considered a commercially reasonable investigation and/or due diligence of the personal guarantor, would it be commercially

_____

[12] *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 82, Lines 13 through 22.

reasonable to know what the president has knowledge of and consider that information?

Answer:     Yes.

Question:   Was that done in this case, in fact?

            MR. PAYNE: With regard to what specifically?

Question:   (By Mr. Craige) The personal financial statement of Mark White that's identical to the personal financial statement of Tina White.

Answer:     Discussions were had with the president on the credit, but there was never any discussion about a financial statement for Mark White with – with me.

Question:   So was that information – should that have been done as part of a commercially reasonable investigation?

Answer:     I should have been aware of it, yes.

Question:   So you were not?

Answer:     I was not.

Question:   So was the conduct of reasonable reliance – the commercial reasonable investigation, was it commercially reasonable in this situation, given what you just said?

Answer:     Given what – I want to rephrase what your question is and make sure I understand it correctly.  You're asking given that the president of the bank had that financial statement, should he have made me aware of it?

Question:   Yes.

Answer:     He should have, yes.

Question:   And the fact that he did not, does that bear on whether or not the bank's conduct was commercially reasonable regarding the financial statement that's in Exhibit 4?

Answer:     It should have been more thoroughly investigated by the bank.

9

Question:     Was it commercially reasonable?

Answer:       No.

Question:     And is that the type of thing that a typical lender would consider a red flag?

Answer:       To have had the statements that we had, would have been a red flag.[13]

*     *     *

Question:     Now, in terms of the – we've sort of got two claims here.  This is what we in the bankruptcy world call financial statement fraud, which is very specific to the financial statement, and then we have what we kind of call actual fraud, which is more general than just a financial statement.  And earlier our discussions were – I believe you told me that the misrepresentations where they are alleged in the Complaint were related to the PSI interest on the financial statement; is that right?

Answer:       Correct.

Question:     And just to clarify, do you know of any other things that were considered to be misrepresentations by you or the bank?

Answer:       On behalf of Tina White?

Question:     Tina White.

Answer:       No.

Question:     Okay.  Knowing what you now know, before – should the bank have relied upon that Exhibit 4 financial statement, as it did, without making any further inquiries?

Answer:       Further inquires [sic] should have been made based on what I know now.

Question:     Knowing that, would you take a look at item number 1 on page 1 of Exhibit Number 8.  On the first page there's two of them.  Do you see

---

[13]   *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 106, Line 1 through Page 108, Line 14.

10

|            | that?                                                                                                                                                                                                                                                                                                 |
|------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Answer:    | Uh-huh.                                                                                                                                                                                                                                                                                               |
| Question:  | Take a moment and read that and tell me if you agree or disagree with that.                                                                                                                                                                                                                            |
| Answer:    | We still had a personal financial statement listed with the name of Tina White solely by herself with a signature line on it saying that she represented that was her – were more questions needed, it appears so, but that would appear, on its face, to be a true and factual financial statement. |
| Question:  | But knowing what you know now, would it be justifiable to rely upon that representation?                                                                                                                                                                                                               |
|            | MR. PAYNE: I'm going to object; it calls for a legal conclusion.                                                                                                                                                                                                                                       |
|            | MR CRAIGE: He's an expert witness.  He's going to testify about what justifiable reliance is.                                                                                                                                                                                                         |
| Question:  | (By Mr. Craige) If you know, testify.                                                                                                                                                                                                                                                                 |
|            | MR. PAYNE:  I'm making my objection for the record.                                                                                                                                                                                                                                                   |
|            | MR. CRAIGE: That's fine.                                                                                                                                                                                                                                                                               |
| Answer:    | Knowing the facts that I know now, it would be – we couldn't rely upon the financial statement that we have in hand here.                                                                                                                                                                              |
| Question:  | (By Mr. Craige) All right.                                                                                                                                                                                                                                                                            |
| Answer:    | It doesn't mean it's not ultimately discovered to be accurate, but at this point, there's lots of questions that need to be addressed.[14]                                                                                                                                                             |

43.     Glen Taylor ("Mr. Taylor") is the expert witness designated by Ms. White in this

adversary proceeding on the issue of commercially reasonable loan practices.  His

---

[14] *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 109, Line 23 through Page 111, Line 25.  The objection by Mr. Payne to the expert testimony of Mr. Fitzgerald is overruled.

qualifications include:

a.     Twenty years experience as a member of the Board of Directors of Arvest Bank, Tulsa;

b.     Fifteen years experience as a member of the Executive Loan Committee of Arvest Bank Group;

c.     Current membership on the Audit Committee for Arvest Bank Group;

d.     He is the President of Taylor & Associates, Inc., a consulting firm specializing in "strategic planning, restructure services and capital formation for new and financially troubled companies."[15]

44.     Mr. Taylor reviewed certain documents related to the Note and the Guaranty as set forth in his written report.[16]  Based upon that review, Mr. Taylor offered the opinion that "[a] typical, reasonable lender in the Tulsa and Northeastern Oklahoma region engaging in commercial lending transactions similar to the transaction in this case would not have relied upon the personal financial statement of the Defendant dated March 31, 2005 [the May 2005 PFS] as alleged in its Complaint filed herein under the facts and circumstances of this case."[17]

45.     The report of Mr. Taylor, including the conclusion set forth above, was presented to Mr. Fitzgerald at his deposition.  When asked if he agreed or disagreed with the conclusion of Mr. Taylor contained in Paragraph 44 *supra*, Mr. Fitzgerald stated that

---

[15]  *Defendant's Exhibit 10* at 10.

[16]  *Defendant's Exhibit 10*.

[17]  *Defendant's Exhibit 10* at 1.

"[b]ased on the discovery of the financial statement of Mark White [the Mark White April 2004 PFS] in relation to this, I would agree with that statement; more questions would have to be asked."[18]

46. At no time relevant hereto did a representative of Regent engage in any face-to-face communication with Ms. White.

47. At no time relevant hereto did a representative of Regent engage in any telephonic communication with Ms. White.

48. Summit has defaulted under the terms of the Summit Loan. Regent is currently owed an amount in excess of $5,000,000 in principal and interest on the Summit Loan.

49. Ms. White filed a petition for relief under Chapter 7 of the United States Bankruptcy Code with this Court on August 1, 2007.

50. Ms. White listed Regent as a creditor in her bankruptcy schedules as a result of her execution of the Guaranty.

## Conclusions of Law

Regent contends that the obligations of Ms. White under the Guaranty should not be discharged for two reasons. First, Regent contends that Ms. White committed actual fraud when she executed the Guaranty because she never intended to honor its terms. In addition, Regent argues that Ms. White's obligations to Regent should not be discharged because the May 2005 PFS contained a false statement: that Ms. White owned an interest in PSI. Ms. White disagrees, and has filed a motion seeking summary judgment in her favor (the "Motion"). The Motion focuses on one

---

[18] *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 109, Lines 6 through 22.

element of each claim: reliance.

### § 523(a)(2)(B) - Use of a False Financial Statement

§ 523(a)(2)(B) of the Code excepts from discharge any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

\* \* \*

(B) use of a statement in writing--

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.][19]

The party seeking a finding of non-dischargeability must establish each of these elements by a preponderance of the evidence.[20]  The Motion focuses upon the element of reasonable reliance.  If Regent cannot survive summary judgment on this element, the Court need go no further.

*Reasonable Reliance*

This Court has previously outlined the standards for reasonable reliance under § 523(a)(2)(B):

---

[19]  § 523(a)(2)(B).

[20]  *Ins. Co. of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113-1114 (3rd Cir. 1995) (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)) (hereafter "*Cohn*"); *accord, In re Cribbs*, 2006 WL 1875366 at \*2 (10th Cir. 2006); *see also In re Watson*, 958 F.2d 977, 978 n.2 (10th Cir. 1992); *Bank of Commerce v. Smith (In re Smith)*, 278 B.R. 532, 537 (Bankr. N.D. Okla. 2002).

This Court adopts the test for reasonable reliance under § 523(a)(2)(B) set forth by the United States Court of Appeals for the Third Circuit in *Cohn*:

> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.
>
> A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Cohn*, 54 F.3d at 1117 (citations omitted); *see also Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993); *First Bank of Colo. Spgs. v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987) ("This standard of reasonableness [under § 523(a)(2)(B)] places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations."). The determination of whether a creditor has reasonably relied upon a financial statement is a question of fact to be decided on a case by case basis. *Id.; see also In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000) (citation omitted).[21]

The test for reasonable reliance outlined in *Cohn* and adopted by this Court in *Smith* has been

endorsed by the United States Court of Appeals for the Tenth Circuit.[22]

---

[21] *Bank of Commerce v. Smith (In re Smith)*, 278 B.R. 532, 537-38 (Bankr. N.D. Okla. 2002) (footnotes omitted).

[22] *In re Cribbs*, 2006 WL 1875366 at *4 (10th Cir. 2006). Regent cites *Cribbs* for the proposition that it was not required to consider any information other than that contained in the Tina White May 2005 PFS in order to reasonably rely upon the same. This Court believes that *Cribbs* speaks for itself, and respectfully disagrees with the position taken by Regent.

15

At oral argument, counsel for Regent admitted that the actionable falsity contained in the May 2005 PFS was the representation that Ms. White owned an interest in PSI.  There is no genuine dispute of fact that, at the time it took the Guaranty and closed the Summit Loan, Regent:

1.      Had in its possession the PSI Credit Memorandum which contained a statement that 3312 Brothers LLC, and not Ms. White, held the ownership interest in PSI;

2.      Had as its president Mr. Lee, the author of the PSI Credit Memorandum, a member of the loan committee that approved the Summit Loan, who knew that the bank had information to the effect that Ms. White owned no interest in PSI;

3.      Had in its possession tax returns for Mr. and Ms. White, which reflected no ownership interest of Ms. White in PSI; and

4.      Had in its possession the Mark White April 2004 PFS and the Tina White April 2004 PFS, which were identical in their listing of assets and liabilities.

Each of these discrepancies meet the requirement of a "red flag" for purposes of *Cribbs, Cohn* and *Smith*.  Regent's own corporate designee and expert witness admitted in his deposition that the existence of these discrepancies should have put Regent on notice that there were potential problems with the representations contained in the May 2005 PFS.  Mr. Taylor, the expert retained by Ms. White, reached the same conclusion.  The existence of these "red flags" and the admission of Regent's own corporate designee and expert witness that Regent should have investigated further renders any reliance upon the Guaranty unreasonable.

At the oral argument on the Motion, Regent argued that the case of *Sawyer v. Mid-Continent Petroleum Corporation*[23] stands for the proposition that Regent, as a corporate entity, should not be

---

[23]  236 F.2d 518 (10th Cir. 1956).

charged with knowledge of the information contained in the PSI Credit Memorandum or within the

ken of Mr. Lee.  Regent's reliance upon *Sawyer* is misplaced.  *Sawyer* involved a claim for

restitution arising out of an oil and gas lease.  The lease, originally entered into between the Sawyers

and an individual known as J. K. Wadley, was later assigned in part to Mid-Continent.  Mid-

Continent drilled an oil well on the property.  The Sawyers claimed that Mid-Continent was required

to drill another well, and demanded that Mid-Continent either drill the well or provide monetary

compensation.  After negotiations, Mid-Continent paid the Sawyers the sum of $14,259.10 under

the mistaken belief that it was required to either pay these sums or drill another well on the property.

Later, officers of Mid-Continent learned that the lease in question contained "unusual provisions"

which eliminated any need for payment of additional sums to the Sawyers.[24]  Mid-Continent then

sued the Sawyers for restitution of the sums paid, using a theory of mistake.  The Sawyers defended

the claim "[r]elying upon the established rule, generally to the effect that knowledge of a

corporation's officers, agents and employees is imputable to the corporation[.]"[25]  The district court

found in favor of Mid-Continent, and the Sawyers appealed.  The Tenth Circuit Court of Appeals

held that

> Since a corporation can act only through its officers, agents and employees, it is
> necessarily chargeable with the composite knowledge of its officers and agents
> acting within the scope of their authority.  And, the examining attorney for Mid-
> Continent undoubtedly knew of the unusual provisions in the lease when he

---

[24] *Id.* at 520.

[25] *Id.*  This is no doubt an accurate statement of the rule.  *See, e.g., ClearOne Commc'ns, Inc. v. National Union Fire Ins. Co.*, 494 F.3d 1238, 1248 (10th Cir. 2007); *W. Diversified Services, Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005) ("It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority.") (citing *Sawyer*);  *Maryland Cas. Co. v. Tulsa Indus. Loan & Inv. Co.*, 83 F.2d 14, 16 (10th Cir. 1936) (Oklahoma case).

approved the title during the transaction with Wadley, and Mid-Continent is therefore chargeable with whatever knowledge the examiner possessed and was under duty to disclose at that time.  But, 'Knowledge acquired by one agent of a principal will not be imputed to the principal in a subsequent transaction negotiated by another agent unless it was the duty of the agent to transmit the knowledge to his principal.'  This must be so, otherwise a corporation would never be allowed to forget with consequent denial of restitution for an honest mistake of a material fact.

There is nothing in this record to indicate that the title examiner had any duty, in the scope of his agency, to ascertain the drilling requirements under the lease and to advise the officers and responsible agents of the corporation thereof, or that he in fact ever did so.[26]

On this basis, the Court of Appeals affirmed the decision of the trial court that allowed Mid-Continent to recover the sums paid to Sawyer as a result of Mid-Continent's failure to drill a second well under the legal principle of mistake of fact.

This case differs from *Sawyer* in several respects.  This is a fraud case, not a case for restitution.  The element of reasonable reliance was not present in *Sawyer*.  Moreover, the information that would have raised the "red flag" regarding Ms. White's ownership interest in PSI existed in written form in Regent's files as well as in the knowledge of Mr. Lee, Regent's president and a member of the loan committee that approved the Summit Loan.  Unlike the title examiner in *Sawyer*, Mr. Lee had a fiduciary duty to act in the best interest of Regent.[27]  Surely this duty would require Mr. Lee to communicate his knowledge regarding the ownership interest in PSI to Mr. Fitzgerald and the other members of the loan committee.  Summit and PSI were not total strangers to Regent or to one another: both were to be borrowers from Regent, and their ownership and

---

[26] *Sawyer*, 236 F.2d at 520 (citations omitted).

[27] *See F.D.I.C. v. Appling*, 992 F.2d 1109, 1113 (10th Cir. 1992) ("Officers and directors of banks are fiduciaries and at common law the liability for their acts is such as stems from such a relationship.") (quoting *Hoehn v. Crews*, 144 F.2d 665, 672 (10th Cir. 1944)).

18

management were related.  According to Mr. Fitzgerald, a cursory review of Regent's records relating to PSI would have raised a "red flag" regarding Ms. White's alleged ownership in PSI. Other information in Regent's possession (most notably the tax returns) also raised this issue.

Regent attempts to distance itself from the information contained in the PSI Credit Memorandum and the mind of Mr. Lee by arguing that, as a matter of policy, this Court should

> not extend a constructive knowledge theory to a bank seeking to except a debt from discharge under Section 523(a)(2)(B). To do so would place too heavy a burden on a bank that has been the victim of a fraud.  The nature of a typical bank's business, including Regent Bank, involves the maintenance of numerous, voluminous loan files that are overseen by different individual bank officers.  To allow a fraud to be perpetrated against a bank by imposing knowledge of inconsistencies between individual documents contained in different files overseen by different loan officers makes the reasonable reliance burden too heavy and aids not the "honest but unfortunate debtor" but instead further assists a fraudulent debtor.[28]

Regent has offered no authority in support of this proposition.  Contrary to Regent's assertions, the Court's ruling today does not "extend" the theory of corporate knowledge: instead, it applies settled law to facts that are not in genuine dispute.  Were it to adopt the position advanced by Regent, the Court would be creating, largely out of whole cloth, a new exception to the doctrine that the knowledge of a corporate officer is imputable to the corporation.  It would also erode the fiduciary duty owed by bank officers and directors to the bank they serve and its shareholders.

### § 523(a)(2)(A) - Actual Fraud

Section 523(a)(2)(A) excepts from discharge any debt

**(2)** for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

**(A)** false pretenses, a false representation, or actual fraud, other than a statement

---

[28] *Docket No. 32-1*  at 3.

respecting the debtor's or an insider's financial condition[.][29]

In order to prevail under this section, a creditor must establish each of the following elements by a preponderance of the evidence:

(1)     That a representation was made by the debtor;

(2)     That the representation was false;

(3)     That the representation was made with the intent to deceive the creditor;

(4)     That the creditor relied upon the representation;

(5)     That such reliance was justifiable; and

(6)     That, as a result of such reliance, the creditor suffered loss.[30]

Unless all of these elements are established by a preponderance of the evidence, the debt is dischargeable.   The focus is upon the issue of justifiable reliance:  if the Court finds, based upon facts that are not subject to genuine dispute, that Regent did not justifiably rely upon the alleged representations of Ms. White as a matter of law , the other elements under § 523(a)(2)(A) need not be considered.

*The Representation*

There is no dispute that, prior to the execution of the Guaranty, Ms. White had no contact with Regent.  The Guaranty contains the following language:

I absolutely and unconditionally guarantee to you [Regent] the payment and performance of the following described debt (including all renewals, extensions,

---

[29]  § 523(a)(2)(A).

[30]  *See In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996) (hereafter "*Young*"); *see also AT&T v. Herrig (In re Herrig)*, 217 B.R. 891, 895-6 (Bankr. N.D. Okla. 1998) (hereafter "*Herrig*") (adopting standard of "justifiable reliance" as set forth in *Field v. Mans*, 516 U.S. 59, 74-75 (1995)).

refinancings and modifications) of the borrower [Summit]: LOAN 243159 IN THE AMOUNT OF $5,000,000.00 DUE 05/16/25.[31]

Mr. Fitzgerald explained Regent's position regarding the meaning of this representation:

> Although I believe that I addressed the essence of Regent Bank's complaint under Section 523(a)(2)(A) in portions of my [deposition] testimony, other portions of the testimony may have given rise to some confusion regarding Regent Bank's legal position under Section 523(a)(2)(A). To alleviate the potential confusion, I want to clarify that an implied misrepresentation or false pretenses upon which Regent Bank relied included Tina White's implied misrepresentation at the time she executed her personal guaranty that she intended to honor her obligation to guarantee the [Summit] loan. Regent contends it was a misrepresentation because at the time she executed the personal guaranty she did not actually intend to fulfill her obligation to Guaranty the [Summit] Loan.[32]

The Court concludes for purposes of the Motion that the alleged misrepresentation in the Guaranty was that Ms. White intended to abide by its terms and pay Regent the amounts due under the Summit Loan upon demand by Regent. Regent claims it relied upon this representation, a statement that the Court treats as true for the purposes of summary judgment. The question is whether such reliance was justifiable as a matter of law.[33]

*Justifiable Reliance*

The United States Supreme Court has given us the following discussion of the concept of "justifiable reliance" as that term is used in § 523(a)(2)(A):

---

[31]  *Defendant's Exhibit 2.*

[32]  *Plaintiff's Exhibit "D",* Affidavit of J. P. Fitzgerald, ¶ 11 at 2-3.

[33]  The Court further concludes as a matter of law that any alleged misrepresentations in the May 2005 PFS are not actionable under § 523(a)(2)(A). It is well established that any cause of action for dischargeability based upon misrepresentations contained in a financial statement may only be brought under § 523(a)(2)(B). *See Cadwell v. Joelson (In re Joelson)*, 307 B.R. 689, 693 (10th Cir. BAP 2004); *see also* 4 *Collier on Bankruptcy* ¶ 523.08[1] at 523-44.7 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2008) ("Paragraphs (A) and (B) of section 523(a)(2) are mutually exclusive.") (footnote omitted).

Since the District Court treated Mans's conduct as amounting to fraud, we will look to the concept of "actual fraud" as it was understood in 1978 when that language was added to § 523(a)(2)(A).   Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the [Bankruptcy Reform] Act [of 1978]. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required.   *Id.,* § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation."   *Id.,* § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage.   *Id.,* § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. <u>Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.</u>"   *Id.,* § 545A, Comment *b.* <u>Justifiability is not without some limits, however. As a comment to § 541 explains, a person is</u>

> <u>"required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation</u>.
>
> Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."   *Id.*, § 541, Comment *a.*

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or <u>he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own</u>."  W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971); (footnotes omitted); accord, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, p. 752 (5th ed. 1984) (Prosser & Keeton).[34]

Under this definition, justifiable reliance is not blind.  A party may not bury its head in the sand and rely on anything it is told, regardless of the facts known to it.

At the time it accepted the Guaranty, Regent knew, based upon information contained in her 2001 and 2002 tax returns, that Ms. White's income from any source was minimal.  According to Regent's designated corporate representative, Regent took the position "that her contribution [to the Summit Loan under the terms of the Guaranty] would come from her asset ownership in both the existing companies she has on her financial statement, [and] the start-up company she was taking a part of."[35]  The only "existing company" on the May 2005 PFS was PSI.  The "start-up company" was Summit, a company whose every asset was pledged to Regent.  Therefore, the question becomes whether Regent could justifiably rely upon the alleged valuation and ownership of PSI as it relied upon the implied misrepresentation of Ms. White that she had the intent to guarantee a five million dollar loan.  The Court believes that the same facts that support summary judgment with respect to the § 523(a)(2)(B) claim also justify a finding that, as a matter of law based upon facts not in genuine dispute, Regent could not have justifiably relied upon the valuation of PSI as it took the

---

[34]  *Field v. Mans*, 516 U.S. 59, 70-72 (1995) (emphasis added) (footnotes omitted).

[35]  *Defendant's Exhibit 9*, Deposition of John Paul Fitzgerald, Page 81, Line 22 through Page 82, Line 1.

23

Guaranty.  Regent had in its possession information that, if given a cursory glance, would have raised serious questions regarding any ownership interest of Ms. White in PSI as well as its valuation as stated in the May 2005 PFS.  Regent may not ignore this information in its possession and argue that "Ms. White promised to pay us and she didn't.  That makes the debt non-dischargeable."

Regent attempts to rely upon *Herrig* in support of its argument that "[r]eliance . . . is justifiable if the falsity of the representation is not apparent to one of his knowledge and intelligence from a cursory glance."[36]  An interesting and persuasive sound bite, to be sure, but one that loses much of its luster when read in context.  The quotation in question was taken by this Court from a decision of the United States Bankruptcy Court for the Eastern District of Pennsylvania.  The entire passage deals solely with the concept of justifiable reliance in the context of credit card usage, and reads as follows:

> Reliance in a credit card context, as in any other context, is justifiable if the falsity of the representation is not apparent to "one of his knowledge and intelligence from a cursory glance." In rejecting those cases that impose a duty to investigate in the absence of anything that would arouse suspicion, the Supreme Court implicitly accepts as justifiable the extension of credit where the card use does not send up any red flags. Thus, following an initial credit check that uncovers no problems, if a cardholder's use is consistent with his past use, and the cardholder is paying the minimum charge and staying within credit limits, reliance on the cardholder's implied representation of intent to repay will generally be justifiable.[37]

In both *Herrig* and *Feld*, the lender was not relying upon the cardholder's representation in a vacuum. The reliance in those cases was justifiable in large part because of the information available to the creditor at the time the charge was incurred (card use consistent with prior use, satisfactory

---

[36] *Herrig,* 217 B.R. at 899, cited in *Docket No. 32* at 22.

[37] *Herrig* at 899, citing *In re Feld*, 203 B.R. 360, 370 (Bankr. E.D. Pa. 1996).

payment history, and charges within credit limits).  Neither *Herrig* nor *Feld* stand for the proposition that a creditor may rely upon a promise while turning a blind eye to facts in its possession that reveal the folly of doing so.

### Conclusion

The motion for summary judgment filed by Tina Coffey White is granted.  This adversary proceeding is dismissed with prejudice.  A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 25th day of September, 2008.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE

5340.5

25